**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

KIA LUNDGREN,

    Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

    Defendant.

No. C06-4013-MWB

**REPORT AND RECOMMENDATION**

_____

*TABLE OF CONTENTS*

*I.*  *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*II.*  *PROCEDURAL AND FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . . *2*

  *A.*  *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*
  *B.*  *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*
    *1.*  *Introductory facts and Lundgren's hearing testimony* . . . . . . *3*
    *2.*  *Supporting affidavits* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *8*
    *3.*  *Lundgren's medical history* . . . . . . . . . . . . . . . . . . . . . . . *11*
    *4.*  *Vocational expert's testimony* . . . . . . . . . . . . . . . . . . . . . *25*
    *5.*  *The ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *26*

*III.* *DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND
   THE SUBSTANTIAL EVIDENCE STANDARD* . . . . . . . . . . . . . . . . . . *28*

  *A.*  *Disability Determinations and the Burden of Proof* . . . . . . . . . . . *28*
  *B.*  *The Substantial Evidence Standard* . . . . . . . . . . . . . . . . . . . . . . *31*

*IV.*  *ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *34*

*V.*  *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *36*

# I. INTRODUCTION

The plaintiff Kia Lundgren ("Lundgren") seeks judicial review of a decision by an administrative law judge ("ALJ") denying her application for Title II disability insurance ("DI") benefits. Lundgren claims the ALJ erred in rejecting the opinion of her treating rheumatologist regarding her ability to work, and in failing to evaluate her credibility properly. (*See* Doc. No. 8)

# II. PROCEDURAL AND FACTUAL BACKGROUND

## A. Procedural Background

On April 8, 2003, Lundgren filed an application for DI benefits, alleging a disability onset date of May 1, 2000.[1] (R. 58-60) Lundgren claimed she was disabled due to fibromyalgia, neurofibromatosis, depression, diarrhea, and cognitive problems. She claimed she had fifty tumors all over her body which would grow into lypomas if she got sick. She indicated she had decreased her working hours steadily over time as her levels of pain, discomfort, and stress increased, eventually stopping work due to pain, discomfort, and loss of the ability to think clearly. (R. 87) Lundgren's application was denied initially and on reconsideration, and Lundgren requested a hearing.

A hearing was held in Sioux City, Iowa, on October 7, 2005, before ALJ George Gaffaney. (R. 361-405) Lundgren was represented at the hearing by Scott Davis. Lundgren testified at the hearing, and Vocational Expert ("VE") William Tucker also testified. On May 11, 2005, the ALJ ruled Lundgren was not disabled. (R. 19-35) Lundgren appealed the ALJ's ruling, and on December 17, 2005, the Appeals Council denied Lundgren's request for review (R. 6-8), making the ALJ's decision the final decision of the Commissioner.

---

[1] At the ALJ hearing, Lundgren amended her alleged disability onset date to November 10, 2003. (R. 364)

Lundgren filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 1) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of Lundgren's claim. Lundgren filed a brief supporting her claim on May 27, 2006. (Doc. No. 8) The Commissioner filed a responsive brief on July 19, 2006. (Doc. No. 9) Lundgren filed a reply on August 5, 2006. (Doc. No. 10) The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Lundgren's claim for benefits.

## B. Factual Background

### 1. Introductory facts and Lundgren's hearing testimony

At the commencement of the hearing, Lundgren's alleged disability onset date was amended from May 1, 2000, to November 10, 2003. Lundgren apparently attempted to continue working as a realtor after her initial alleged disability onset date. Although she did not reach what she considered to be a substantial gainful activity level of earnings, she nevertheless elected to simplify consideration of her application by amending her disability onset date to the date she last worked. (*See* R. 364-65, 374)

The ALJ hearing was held three days before Lundgren's forty-eighth birthday. According to Lundgren, she became totally unable to work on November 10, 2003. She stated her most debilitating medical problems that prevent her from working are pain and overwhelming fatigue. She also has problems sleeping, and problems with irritable bowel syndrome. She stated her pain is worsening steadily. She described the pain as burning and stabbing, and stated her legs are numb from her hips downward. (R. 374, 377)

Lundgren's attorney summarized how the dosage of Lundgren's pain medication, Darvocet, was increased from one pill per day in June 2003, to two pills a day in August

2003, to three pills a day in February 2004, and then to four pills a day in May 2004. (R. 368-69) Lundgren agreed with her attorney's description (R. 374), and testified her medication had been increased due to an increase in her pain. (R. 75) She stated she had a hysterectomy in 2002, and her pain had been increasing since the surgery. According to Lundgren, she had pain medications for a time following her surgery, but then her doctor indicated he did not want to prescribe ongoing pain medications without knowing the cause of her pain. As a result, Lundgren had no pain medication for a few months. She then began seeing Robert Wisco, M.D., who started her on the Darvocet. (R. 375-76)

Lundgren stated the Darvocet does not alleviate her pain completely. She also takes Neurontin for pain. She described her pain as "body-wide." Different parts of her body will hurt worse on some days than others. For example, on some days, her legs and hands hurt the worst, while on other days, her neck and lower back might hurt the worst. She never knows what to expect in terms of pain when she awakens each morning, either regarding where the pain will manifest itself the worst, or how severe the pain will be. She indicated her pain level may change from one moment to the next and from day to day. She never has a day free from pain. On an average day, her pain level will be seven to eight on a ten-point scale. (R. 376-77)

Lundgren stated her ability to sit, stand, and walk is affected by her pain, and pain limits her ability to perform household tasks. She indicated she is unable to sustain any activity for a long period of time. She has difficulty coping with the pain and does not know how she can reach a point where she can cope with it. During the hearing, she indicated she was tense and nauseous, and her legs and head hurt. (R. 378)

Lundgren indicated her constant fatigue is a problem equal to her pain. According to Lundgren, she has not had a full night's sleep "in a very long time." (R. 378-79) She has difficulty laying in one position for very long due to pain in her legs and hips, and also because her legs will twitch and move around. She takes Neurontin at bedtime which

helps somewhat, but it does not last throughout the night. She awakens frequently during the night and will get up, use the bathroom, get a drink of water, and move around for awhile. When she gets up in the morning, she feels exhausted, often as though she had not slept at all. Lundgren rated her average fatigue level at an eight or nine on a ten-point scale. She stated her fatigue affects her ability to function during the day. She does not nap but she takes frequent breaks to stretch her muscles and rest in her recliner. She estimated that on average, she spends at least half of the day sitting and resting in her recliner. (R. 379-80)

Lundgren believes her medications contribute to her fatigue. She stated Neurontin makes her groggy and affects her memory, concentration, and physical responses. She has tried other medications but experienced side effects from them. For example, according to Lundgren, Vioxx elevated her blood pressure to 172/108. (R. 381) Paxil, an antidepressant, caused her to break out in hives and vomit, and she had a similar reaction to the blood pressure medication Toprol. (R. 382) Lundgren indicated she uses several non-prescription medications for pain. In addition to Tylenol, she also takes Ibuprofen, and she uses a muscle rub and bath salts. (R. 385)

Lundgren stated she has a constant headache, present "all day, every day, to one degree or another." (R. 382) She described her headaches as follows:

> On the very worst days the headache hurts so bad it hurts to breath[e], my face will have spasms. I vomit. I'm sensitive to light and to sound, and those are on the very worst days. On a good day with the headaches it's just – it's a headache that hurts.

(R. 383) She has one of the bad headache several times per week, and sometimes they can last for several days at a time. (R. 383-84) To treat the headaches, she takes Percocet, supplemented with additional Tylenol, and sits in a recliner in her living room with the blinds closed and her eyes closed. Until she gets some relief from the headache pain, it hurts to breathe, she is unable to eat, she may lose track of time, and she basically is

nonfunctional.  She stated that even on the days when she has a "normal" headache, her pain level is at an eight or nine on a ten-point scale, and she would not be able to function in a work environment.  (R. 385-87)

According to Lundgren, one of her doctors suggested there may be some correlation between her headaches and sinus problems.  She indicated the doctor ordered an MRI about a year prior to the hearing, and Lundgren understood the MRI to indicate that she had lesions of some kind in her skull cavity or brain.  (R. 386)

Lundgren also suffers from irritable bowel syndrome.  She stated she has three to four occurrences per day when she has to reach a bathroom very quickly.  She may spend up to forty-five minutes at a time in the bathroom, including the time it takes her to clean up following an episode.  She indicated that when she goes out in public, the first thing she does is locate the nearest bathrooms.  She has failed to make it to the bathroom in time on occasion, so she carries a change of clothes with her in her car.  She has had incidents repeatedly where she has soiled her clothing when she has been out in public.  Lundgren stated her bowel problems alone would hinder her ability to work.  (R. 387-89)

Lundgren also stated her depression is a factor in her inability to work.  She explained she is having difficulty understanding her physical problems and she cries daily.  She suffers from feelings of frustration, guilt, and worthlessness, and she feels she is a burden to others.  (R. 389-90)  She stated her bowel problems are exacerbated by her stress level, and she has problems with her memory and concentration.  She indicated she turns down social invitations and has begun withdrawing from people.  (R. 391)

Regarding her memory and concentration difficulties, Lundgren stated her pain level and her headaches affect those areas of cognitive functioning.  She gave examples of her memory problems including her inability to remember whether or not she has turned off the coffee pot or stove, and forgetting even simple conversations such as what time to meet

someone. She stated her husband took over paying the household bills because Lundgren would forget to pay some things. (R. 391-92)

Lundgren estimated she would be able to sit for half an hour before she would have to get up and move around. She estimated she could stand in one place for ten to fifteen minutes, and she could walk for fifteen to twenty minutes at a time. She estimated she could do these activities for a total combined time equal to about half of an eight-hour work day. Her inability to sit, stand, or walk about for longer periods of time is due to her pain, exhaustion, and lack of coordination. (R. 392-93) [2]

Lundgren stated she is unable to lift a gallon of milk with one hand, and she doubts she could do so with both hands. On a good day, she is able to put in a load of laundry. She can do dishes if she takes breaks and sits down every few minutes, but it is too painful for her stand and do the dishes all at once. She usually can do household chores for fifteen to twenty minutes, and then she will take a break lasting from thirty to forty-five minutes. Her husband does most of the grocery shopping, and Lundgren may accompany him if she feels up to it. (R. 393-94) Lundgren stated that two years earlier, she and her husband had to move because of her medical problems. They bought a single-level home with a flat entrance. (R. 394)

Lundgren and her husband drove from their home in Sioux City to Waterloo, Iowa, in May 2004, when their daughter graduated from college. The drive took about three hours. They stopped several times along the way for Lundgren to use the bathroom and to stretch. Lundgren did not make any other trips during the year. (R. 395)

According to Lundgren, she has not been able to take all of the treatments recommended by her doctors due to lack of insurance coverage or funds. She stated her husband was laid off from work in June 2004, causing them to lose their health insurance.

---

[2]The court notes Lundgren stood up very briefly near the end of the hearing. In response to the ALJ's question, Lundgren indicated that standing up for a moment allowed her to stretch, after which she could sit down again. (R. 399)

(R. 396)  She had been unable to fill a new prescription for pain medication that her doctor recommended.  She also had been unable to attend physical therapy, but she tried to walk back and forth in the flat area behind her house, and she did home exercises three times per week to try to stay limber.  (*Id.*)  Lundgren has continued seeing her doctors, making small monthly payments.  She stated her counselor's fee is income-based.  (R. 397)

Lundgren stated at the time of the hearing that she weighed 225 to 230 pounds, which was down from her weight of 267 two years earlier, at the time of her hysterectomy. (R. 398)

## 2.    *Supporting affidavits*

The administrative record contains several affidavits in support of Lundgren's application for benefits.  Lundgren's mother, Ingegerd Downing, noted her daughter, formerly an avid reader, no longer reads because she is unable to follow a complicated plot with numerous characters.  She indicated Lundgren cannot recall telephone numbers and addresses of family members whom she has visited many times.  In Downing's opinion, Lundgren is unable to process simple information that seems clear to others.  According to Downing, Lundgren began seeing doctors regularly in the 1980s for painful lumps or bumps on her arms, legs, and back.  In the 1990s, Lundgren began seeing doctors and having tests to try to find the cause for her pain, headaches, and other medical problems. She noted that her daughter worked at a number of different jobs during the 1990s, but none of them lasted for very long, either because Lundgren was unable physically to maintain the work, or because she was fired due to poor attendance caused by her frequent illnesses.

By the time Lundgren was diagnosed with fibromyalgia and neurofibromatosis in 2003, Downing observed her daughter having difficulty with daily tasks, including combing her hair and getting dressed.  She noted Lundgren no longer drives, nor should

she due to her slow, uncoordinated leg and hand movements. She indicated Lundgren becomes exhausted when attending family events, and she has memory and concentration problems. (R. 145-47)

Lundgren's husband, Kevin Lundgren ("Kevin"), is a licensed plumber in South Dakota. He indicated he met Lundgren in 1991, and she "was active, happy, always smiling," and enjoyed cooking and canning. He stated that since 1999, Lundgren has been unable to stand long enough to cook, so he cooks all of their meals. In addition, he has taken over household chores, doing the dishes, dusting, vacuuming and other cleaning, organizing, and keeping the house picked up. According to Kevin, Lundgren is unable to do these tasks because her hands, arms, and legs are constantly in pain.

Kevin stated his wife loved being a real estate agent. He noticed that during her last few years of work as a realtor, it became more and more difficult for Lundgren to get in and out of the car and go into houses she was showing. According to Kevin, Lundgren finally gave up her real estate career because she was unable to concentrate sufficiently to do her job, she was in pain, and she was unable to give her clients "100% of what they deserved."

Kevin also indicated Lundgren's illness has affected her memory. According to him, Lundgren will leave on lights, water faucets, the coffee pot, etc. She also will tell him the same thing over and over again, forgetting she has told him already. He also reminds her to take her medications in the evenings.

Kevin stated Lundgren's pain appears to be worst in high humidity. He helps Lundgren out of bed in the mornings and into bed at night, and he helps her get around during the day. He indicated they had to buy a ranch-style home without any steps so Lundgren could get around better at home. Kevin expressed sadness and frustration at his inability to take away Lundgren's pain, indicating he does all he can to make her life as comfortable as possible. (R. 151-52)

A former coworker and current friend, June Dias, stated she first met Lundgren in about 1990, when Dias began working as a secretary at HomeLand Realty, where Lundgren was employed as a realtor. Dias stated she and Lundgren spend a lot of time together and their daughters play together. She has observed Lundgren both in the workplace and in her home. According to Dias, Lundgren was "very committed to her work as a real estate agent." She was very professional, took pride in her work, and worked long hours. Dias began noticing changes in Lundgren in about 1999, which she described as follows:

> Starting in approximately 1999, I observed that [Lundgren] began to be easily fatigued. This was completely out of character for her. She began to turn down work and even recreational activities that she once had greatly enjoyed. Prior to this time, [Lundgren] would routinely work evenings and weekends without complaint and spend spare time with friends. She had effortlessly balanced her work life and home life and excelled at both.

> Beginning in 1999, I also noticed that [Lundgren] became unsteady on her feet and was unable to stand for any period of time due to exhaustion. She also began to frequently complain of burning pain and weakness in her arms, hands and legs. [Lundgren] also complained about frequent and painful diarrhea. She no longer had the same energy level or outgoing personality when working with the public. This was totally unlike her because she loved working with people, but her fatigue and weakness caused her to withdraw.

> . . .

> The deterioration in [Lundgren's] condition since 2000 has been dramatic, in my opinion. I have observed that she experiences almost constant severe pain and severe exhaustion. On many occasions, I have seen and heard [Lundgren] cry out in pain when exerting herself even when trying to simply sit down. In addition, she and her husband Kevin have told me that she is unable to obtain any meaningful sleep. I have observed that she is only able to walk for short distances

without assistance before the pain and fatigue make[] her stop
to rest. She also frequently needs help for something as simple
as getting in and out of a chair.

(R. 148-49) Dias goes on to describe Lundgren's ongoing weakness, balance problems, stumbling, problems with memory and concentration, and the unpredictable degree of difficulty Lundgren will have from day to day. (*See* R. 149)

Lundgren's former employer, William W. LaBahn, who is half owner of American Colonial Realty in Sioux City, observed that Lundgren "became less and less reliable as time went on," failing to show up for floor duty or weekly meetings. He noted Lundgren's physical appearance also changed, indicating Lundgren "looked tired, dressed sloppy," and "just started looking rather rough, and disconnected." LaBahn and his partner determined that Lundgren "was not an asset to the company" and asked Lundgren to leave. They learned she went to work for another company, but according to LaBahn, that job also did not work out and "her new broker was very unhappy also." (R. 144)

### 3. *Lundgren's medical history*

Lundgren's gallbladder was removed in late November 2000, following several weeks of digestive symptoms and diarrhea. Doctors cautioned Lundgren that the surgery might not resolve the diarrhea problem, but should address her other symptoms. She tolerated the procedure well, although she suffered a brief setback when her seventy-pound dog jumped on her abdomen the day following surgery. (*See* R. 162-63, 171-77)

Lundgren saw her family doctor, Thomas E. Schryver, M.D., on July 11, 2001, with complaints of pain in her fingers and joints, ankle swelling off and on for several months, "[q]uestionable malar rash, [and] questionable muscle pain." She had no visible symptoms. Lab tests for inflammatory conditions were negative, and she did not have any significant swelling in her ankles at the time of the exam. Dr. Schryver noted Lundgren

had "a symptom complex of pedal edema and myalgias. Rule out connective tissue disease." (R. 222)

Dr. Schryver saw Lundgren for follow-up on August 16, 2001. She continued to have complaints of persistent soft tissue muscle pain and fatigue. Dr. Schryver did not believe Lundgren's symptoms "fit the picture of fibromyalgia." (R. 221) He planned to consult with other physicians about whether an EMG or muscle biopsy would be helpful. He suggested Lundgren take over-the-counter anti-inflammatory medications, and he ordered a Monospot and hormone levels. (*Id.*) Lundgren returned for follow-up on August 29, 2001. Dr. Schryver noted Lundgren's test results indicated she was "early menopausal at age 42," with a quite low estradiol level. Lundgren's thyroid was visibly enlarged, and the doctor ordered thyroid tests. He also prescribed an antibiotic for some mosquito bites. (*Id.*)

Lundgren saw Dr. Schryver again on October 29, 2001, for sinusitis. He had started Lundgren on Cenestin, a drug used to treat vasomotor symptoms of menopausal women, and although Lundgren continued to have symptoms, she was feeling better. (R. 220) She saw Dr. Schryver again on December 12, 2001, complaining of wrist pain after falling the previous evening. The doctor diagnosed a left wrist sprain, put her wrist in a splint, and directed her to keep the wrist elevated and use ice and anti-inflammatories. (*Id.*)

Lundgren saw a neurologist on December 14, 2001, with complaints of numbness and tingling in her arms and legs and "abnormal walking." (R. 211) In particular, she complained of leg numbness; twitching, particularly at night; difficulty maintaining her balance while walking; and hurting and throbbing in her feet. She also complained of heightened fatigue, forgetfulness, pain in her hands, chronic sinus difficulties, ear congestion, difficulty manipulating things with her hands, and crying easily. (R. 207) An EMG/NCV study was negative for any signs of significant abnormalities of her right arm

or leg, or evidence of myopathy, peripheral neuropathy, or focal nerve compression. (R. 211, 213) She underwent an MRI of her cervical spine on December 19, 2001, which revealed "[m]iminal anterior spondylolisthesis of C3 upon C4," but otherwise was negative. (R. 212) Upon review of the MRI, neurologist Christopher A. Hughes, M.D. found as follows:

> Multifocal white matter change in the periventricular region and axial images suggest involvement of the corpus callosum but with no sagittal FLAIR sequences this cannot be determined. These may be nonspecific or consistent with demyelinating disease. Sagittal FLAIR sequence should be obtained.

(R. 211)[3] Sagittal FLAIR sequences were obtained subsequently, but "[o]nly a few scattered white matter changes were seen." (R. 205)

On January 25, 2002, Lundgren returned to see Dr. Schryver for follow-up of abnormal thyroid levels. Dr. Hughes had advised Lundgren to be treated for low thyroid levels. He also wanted B12 and sed rate tests. Dr. Schryver ordered several lab tests. (R. 219)

Lundgren underwent a sleep study on January 30-31, 2002, to evaluate her complaints of excessive daytime sleepiness, snoring, and waking up gasping. The study was "mildly abnormal showing a sleep efficiency of 85% and disrupted sleep architecture . . . due to multiple arousals," mostly "related to snoring and disordered breathing." (R. 209) Doctors diagnosed "upper airway resistance syndrome," and recommended Lundgren sleep on her side and lose weight. (R. 209-10)

Lundgren underwent an EEG study in February 6, 2002, to evaluate a suspected seizure episode that occurred on February 4, 2002. The EEG showed no abnormal

---

[3]"FLAIR" is an acronym for "fluid-attenuated inversion recovery" MRI imaging, a type of imaging that makes it easier to see certain lesions in the brain, such as those that otherwise might be obscured because they are too close to cerebrospinal fluid.

waveforms, but did show some fast activity in the central and frontal regions. The neurologist found the generalized fast activity was not diagnostic of epilepsy. (R. 179)

Lundgren saw the neurologist for follow-up on February 26, 2002. The doctor explained that all of the tests had failed to reveal evidence of any neurologic disease that would account for Lundgren's chronic pain and complaints of numbness. He noted Lundgren was scheduled to see Robert C. Wisco, M.D. for a rheumatologic evaluation of possible inflammatory arthritic conditions. (R. 204)

On July 19, 2002, Lundgren underwent a complete hysterectomy and bilateral salpingo-oophorectomy to address long-term complaints of chronic pelvic pain, dysfunctional uterine bleeding, and other gynecological complaints. (*See* R. 180-89, 217-19) She tolerated the procedure well and was discharged the second day following surgery. (R.185)

On February 12, 2003, Lundgren saw Robert Wisco, M.D. for a rheumatologic consultation to assess the possibility of fibromyalgia. Lundgren gave a history of the onset of musculoskeletal problems in the late 1980s, when she began experiencing discomfort in her hands and forearms, worse on the right, coupled with fatigue and problems thinking clearly. She indicated she would have symptoms for a time, the symptoms would resolve, and then they would return. These cycles repeated over several years, gradually increasing in severity and frequency. She saw doctors off and on and had various tests, but no specific treatment ever was prescribed. (R. 200)

By 1999, when she began seeing Dr. Schryver, Lundgren stated she was having increased achiness in her arms and shoulders, as well as progressively severe discomfort in her feet, calf muscles, and thighs. She indicated that although her symptoms seemed to wax and wane, she had been in constant discomfort for the previous two years, and fairly often the pain was severe. Her pain increased progressively with activity. She indicated her doctors had suggested she see Dr. Wisco about a year earlier, but she had

experienced other health problems during that time and had not been able to arrange to see him that soon. Lundgren stated she had "done horribly" over the past year, with "total body pain that again waxes and wanes." (*Id.*) She reported only sleeping a couple of hours per night, having persistent headaches and neck pain, and experiencing a decreased energy level. (*Id.*)

According to Lundgren, her symptoms improved slightly whenever she was on antibiotics. She indicated over-the-counter anti-inflammatory medications had not helped her much. She was trying to work as a real estate agent but was having difficulty due to her achiness and fatigue. She stated she could manage her home, although again with some difficulty. She was smoking about half a pack of cigarettes daily and consumed a few alcoholic beverages on weekends. She stated she used to walk her dog regularly, but she had ceased most physical exercise during the previous three years. She also described problems with erratic bowel habits, occasional slightly blurred vision, and occasional shortness of breath. (R. 200-01)

Upon examination, Lundgren exhibited tenderness over several areas of her body, but otherwise the doctor noted little objective evidence of any disease process. He opined Lundgren's bilateral heel pain could be due to plantar fasciitis or some mechanical strain of the feet, and he advised Lundgren to wear appropriate shoes. Dr. Wisco found no evidence of a systemic inflammatory disorder. With regard to Lundgren's total body pain process, fatigue, poor sleep, headaches, and irritable bowel syndrome, Dr. Wisco indicated that taken together, these symptoms were "classic for fibromyalgia." (R. 203) He advised Lundgren that total pain resolution was unlikely, although if she responded to appropriate treatments, "one would hope that she might have adequate control of her generalized discomfort on most days." (*Id.*) He stressed the need for Lundgren to begin a regular conditioning exercise program, and to reduce her stress level, which he indicated could exacerbate her symptoms. He prescribed a low dosage of Amitriptyline to see if it

would improve Lundgren's sleep. He also gave her a sample of Vioxx 25 mg. to try once daily. He directed Lundgren to return for follow-up in two months. (*Id.*)

Lundgren returned to see Dr. Schryver on March 7, 2003, with continued "fibromyalgia complaints," as well as sinusitis and primary hypertension. (R. 216) The doctor opined the Vioxx was raising Lundgren's blood pressure, and he directed her to stop taking the medication. He prescribed Amoxil for the sinusitis. (*Id.*)

Lundgren saw Dr. Schryver again on March 14, 2003, complaining of diarrhea and atypical chest pain that occurred shortly after eating or lying down. An EKG was normal, and her heart and lungs were within normal limits. The doctor opined the diarrhea could be from the Amoxil, and he advised Lundgren to take Imodium as needed. (*Id.*)

Dr. Schryver saw Lundgren on April 14, 2003. Lundgren had tried Zyban to quit smoking, but had reacted to the drug. She planned to try quitting without any chemical aid. Lundgren described lumps she had had on her neck, but they were gone by the time of the exam. The doctor prescribed Cortisporin otic drops for an earache. (R. 215)

On May 23, 2003, Lundgren returned to see Dr. Schryver with fibromyalgia complaints of aches and pains. He prescribed a trial of Paxil. He also prescribed Keflex for a minor sore throat and low-grade fever. Lundgren also complained of pain in the back of her neck. The doctor noted Lundgren felt "run down," and he opined as follows: "I think because of her fibromyalgia and chronic complaints of pain, she just doesn't have the energy to do things. She has actually backed off as a realtor in that respect. That is affecting her mood, I believe." (R. 214)

Lundgren saw Dr. Wisco for follow-up on June 20, 2003. The doctor noted Lundgren had called his office numerous times since her evaluation in February. She had stopped taking the Vioxx, and the Amitriptyline had caused her too much next-day sedation. Dr. Wisco had prescribed Neurontin 100 mg/nightly, and gradually increased the dosage to 300 mg/nightly. Lundgren reported a slight improvement in her sleep since

she started the Neurontin; however, it had not helped her musculoskeletal achiness. Dr. Wisco also had prescribed Darvocet for Lundgren's more severe pain, and she reported it helped somewhat and had been well tolerated. She complained of variable amounts of total body discomfort, often fairly severe; fatigue and poor energy; variable levels of headaches; continued sleep disturbances; and pain upon any activity. Dr. Wisco continued to note Lundgren's symptoms were "most consistent with fibromyalgia." (R. 241) He increased her Neurontin dosage to 300 mg. morning and night, and recommended she talk with Dr. Schryver about increasing her Paxil dosage to address her depression. (*Id.*)

On July 8, 2003, Lundgren underwent a psychological/intellectual assessment by John A. McMeekin, Ed.D., at the request of Disability Determination Services. (R. 243-49) Dr. McMeekin diagnosed Lundgren with a Cognitive disorder, not otherwise specified. He noted she had not left her real estate job due to cognitive deficits, but she did describe problems in her daily life due to difficulty with memory and understanding. He noted she scored average or higher on intelligence tests. He noted Lundgren's pain was "relatively constant but does fluctuate from bad to severe," and this would affect her ability to carry out instructions and to maintain attention, concentration and pace. He opined Lundgren should be able to interact appropriately with supervisors, coworkers, and the public; use good judgment; and respond appropriately to changes in the workplace. Despite Lundgren's report that she no longer can handle cash and balance her checkbook, Dr. McMeekin nevertheless opined Lundgren should be able to handle benefits. (R. 248-49)

On July 30, 2003, Melodee S. Woodard, M.D. reviewed the record and completed a Physical Residual Functional Capacity Assessment regarding Lundgren. (R. 50-58) She noted that prior to February 12, 2003, the record evidence was "insufficient to establish the presence of a severe physical impairment." (R. 250) Dr. Woodard opined Lundgren

should be able to lift twenty pounds occasionally and ten pounds frequently; sit for up to six hours in a normal workday, with normal breaks; and stand, or walk, with normal breaks, for a total of six hours in a normal workday. (R. 251-52) Dr. Woodard opined Lundgren would have occasional limitations in all postural activities. (R. 254) Dr. Woodard found Lundgren's subjective complaints to be "significantly disproportionate to the objective evidence on file." (R. 257) She opined that with ongoing care and compliance with her physicians' recommendations, Lundgren's functional status should improve. (*Id.*) On November 21, 2003, J.D. Wilson, M.D. reviewed the record and concurred in Dr. Woodard's conclusions. (R. 258)

On August 6, 2003, Lon Olsen, Ph.D. reviewed the record and completed a Psychiatric Review Technique form concerning Lundgren. He opined that due to psychiatric problems, Lundgren would have only a mild degree of limitation in her activities of daily living, and moderate limitations in her ability to maintain social functioning and to maintain concentration, persistence, or pace. (R. 259-72) On November 12, 2003, Rhonda Lovell, Ph.D. reviewed the record and concurred in Dr. Olsen's conclusions. (R. 259)

In a concurrent Mental Residual Functional Capacity Assessment, Dr. Olsen opined Lundgren would have moderate limitation in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; and travel in unfamiliar places or use public transportation. Otherwise, he found she would not be significantly limited in any mental activity. (R. 273-75) Dr. Olsen noted that overall, Lundgren attributed most of her limitations to her physical condition, although she did report some cognitive difficulties. He opined Lundgren "would be capable of activities that did not require attention to detail,

sustained vigilance, frequent changes in routine, intense supervisory oversight, or travel in unfamiliar areas." (R. 277)

Lundgren returned to see Dr. Wisco for follow-up on August 26, 2003. Lundgren continued to complain of overall body pain and tenderness, including a burning pain in her skin, often severe. Dr. Wisco noted Lundgren had not done well on any of the medications prescribed to date, and he expressed "concern[] that she is going to have rather severe fibromyalgia that might be refractory to treatment." (R. 278) Lundgren had not experienced side effects from the Neurontin, and Dr. Wisco increased that dosage to 600 mg in the morning and at night, and 300 mg in the afternoon. He continued her Darvocet dosage without change. He noted Lundgren planned to apply for disability benefits, and he advised her that he did not do formal disability evaluations. (R. 278-79)

Lundgren saw Dr. Schryver on September 3 and October 23, 2003, with complaints of sinusitis and earache. He prescribed Zyrtec. At the September visit, the doctor noted Lundgren exhibited tenderness "with minimal palpation of her trapezius and her neck," although she had full range of motion of her neck. (R. 345)

Lundgren saw Dr. Wisco again on November 3, 2003, for follow-up of her fibromyalgia. The increase in Neurontin had provided some improvement in her discomfort, although she still had widespread discomfort, severe at times. She continued to have problems with fatigue and persistent headaches, some of which she thought could be related to sinus congestion. The Neurontin was causing her to be more groggy and forgetful. Dr. Wisco suggested she reduce her afternoon dosage of Neurontin to 100 mg. to see if that would help the grogginess. (R. 322)

On November 10, 2003, Dr. Wisco wrote a letter to Lundgren's attorney in response to his request that the doctor fill out a functional capacity evaluation form. He explained that he does not do functional capacity evaluations, as he had informed Lundgren

previously. He noted Lundgren carries a diagnosis of fibromyalgia. Regarding Lundgren's ability to work, Dr. Wisco offered the following opinion:

> [W]ithout being able to do specific evaluations of her functional work capacity, it is difficult to answer your question as to how and why she would be limited in a work environment. In general, I would think that she would have difficulties with doing any activity requiring prolonged walking or prolonged standing. Doing lifting, bending, or kneeling tasks would also be most difficult. Any forceful pushing and pulling activities would also probably be very poorly tolerated. I would think that she should be able to do a sedentary work activity involving minimal repetitious hand use. Again, this is only a general impression of her ability to work. Again, if she were able to find the right type of work activity, she could be able to sustain some full-time work. Whether or not this would be compatible with her past training is uncertain. Again, not knowing her before February of 2003, I would not be able to comment on her ability to sustain any type of full-time work.

(R. 317)

Lundgren saw Dr. Schryver on November 25, 2003, with complaints of headaches and fibromyalgia symptoms. Lundgren stated she was in pain all of the time, which made it difficult for the doctor to determine if her headaches could be from some other cause. He noted tenderness on palpation was consistent with occipital neuralgia and/or fibromyalgia. The doctor recommended physical therapy, but Lundgren stated she preferred to see a chiropractor. She planned to see what her insurance would cover. Dr. Schryver ordered an MRI of Lundgren's head. (R. 344)

Dr. Schryver saw Lundgren on December 8, 2003, for follow-up of her MRI, which he noted showed "small vessel changes in the head." (*Id.*) He apparently had switched Lundgren from Paxil to Prozac at some point, because notes indicate the doctor was considering increasing Lundgren's Prozac dosage. (*See also* R. 385, where Lundgren indicates the Paxil caused her to break out in hives.)

On December 15, 2003, Dr. Wisco wrote a letter to Lundgren, apparently in response to her request that the doctor review the recent MRI scan of Lundgren's brain. Dr. Wisco indicated the tiny lesions visible on the MRI could "go along with many things, most commonly high blood pressure." He doubted there was any significant problem, and notably indicated the lesions would not explain Lundgren's total body pain problems. (R. 321)

On January 13, 2004, Lundgren saw Dr. Schryver with complaints of diarrhea and sinusitis. She noted her diarrhea was worse in times of stress, and the doctor opined her symptoms sounded like irritable bowel disease. He prescribed an antibiotic for the sinusitis. (R. 343)

On January 20, 2004, Dr. Schryver wrote a referral note for Lundgren to receive a "physical therapy consultation regarding myofascial release exercises for chronic headaches." (R. 342) He noted Lundgren had suffered from "chronic tension headaches" for some time, and he suggested she might benefit from a home exercise program as an alternative to further chemical therapy. (*Id.*)

Lundgren saw Dr. Wisco again on February 4, 2004, for follow-up. Lundgren stated she was awaiting insurance approval for the physical therapy recommended by Dr. Schryver to address Lundgren's chronic headaches. Lundgren's overall achiness continued to wax and wane. The Neurontin had helped some of her symptoms a bit, particularly some of the burning sensations in her arms and legs, but it had done little to improve her total body pain problem. She continued to feel groggy and fatigued during the day, and wondered if her nighttime Neurontin dosage was too high. She also wanted to increase her Darvocet-N 100 dosage on days when she experienced a severe headache. Dr. Wisco opined Lundgren's headaches likely were part of her fibromyalgia. He changed her Neurontin dosage to 200 mg morning and afternoon and 400 mg at night. He also increased her Darvocet dosage up to three times daily as needed for severe pain. He

encouraged Lundgren to follow up with the physical therapy in hopes it would alleviate some of her headaches. (R. 319-20)

On February 5, 2004, Dr. Schryver wrote a letter regarding Lundgren's "chronic tension headaches for many years." (R. 341) He noted Lundgren was seeing a rheumatologist for "some discomfort related to a diagnosis of fibromyalgia." (*Id.*) He stated Lundgren's headaches appeared to occur weekly, "triggered by flare-ups of her fibromyalgia, stress, and typical exacerbating factors such as lack of sleep." (*Id.*) He noted Lundgren had benefitted from physical therapy and over-the-counter analgesics, as well as the Neurontin and Darvocet she took for her fibromyalgia. He further opined emotional factors contributed to a significant worsening of Lundgren's pain. Dr. Schryver gave the following opinion regarding how Lundgren's headaches would affect her ability to work:

> The patient's prognosis is one of expected intermittent headaches with exposure of recurrent stressors. The patient has a headache pattern that will either preclude [her] from attending work but is not something that would respond to having a break at work. The patient is capable of low stress jobs and occasional moderate stress given that she has performed in that capacity in the past.

(*Id.*)

On February 19, 2004, Lundgren saw Dr. Schryver with complaints of abdominal pain, bloody stools, low-grade fever, sinusitis, and general malaise. (R. 340; *see* R. 295) He referred her to a surgeon, Paul E. Johnson, M.D., for evaluation. Dr. Johnson noted a palpable, small mass in Lundgren's right lower abdomen, noting it could be an incarcerated hernia, a lipoma, or neurofibroma. She was directed to treat her pain symptomatically with unspecified medicines she had at home, and to return for follow-up in four days. (R. 295-97) Lundgren rescheduled her follow-up exam twice, and saw Dr. Johnson again on March 1, 2004. Lundgren continued to complain of abdominal pain,

although it was somewhat improved. The palpable lump was still present in her lower abdomen. Dr. Johnson also noted Lundgren had "multiple lipomas in both arms." He discussed with Lundgren the option of removing the tender lump in her abdomen, but because of a $4,000 insurance deductible, she was reluctant to have any treatment requiring hospitalization. (R. 294-95)

Lundgren saw Dr. Schryver on March 26, 2004, complaining of "severe facial pain and pressure," and increased sinus drainage, despite three weeks of Biaxin. He prescribed Augmentin, Nasacort, and Kenalog. (R. 339)

Lundgren saw Dr. Wisco again on May 28, 2004, "for follow-up of her rather severe fibromyalgia" and "chronic headaches." (R. 318) Lundgren reported that since her February visit, her headaches had been her greatest problem. She reported having severe headaches three or four times a week. She continued to think the Neurontin was helping somewhat with her total body pain. Her dosage had been increased, and she was taking 300 mg morning and afternoon and 400 mg at night. Dr. Wisco raised Lundgren's Darvocet dosage to four pills per day as needed for severe pain. They discussed a trial of a TENS unit, applied to her posterior neck, and the doctor gave her a referral for this. (R. 318; *see* R. 351)

On July 7, 2004, Lundgren began seeing therapist Kathleen A. Mugan at Boys and Girls Home and Family Services, Inc. Among other things, Lundgren "expressed guilt and shame regarding her lack of physical stamina to be employed, [and] the detrimental [e]ffect her illnesses have had on her children." (R. 360) Lundgren saw the therapist weekly through September 9, 2004. (R. 352-60) Lundgren noted she felt better overall when she was on antibiotics, but she nevertheless suffered from chronic illness and anxiety. The therapist noted Lundgren was inconsistent at times regarding the nature and onset of her physical difficulties, and regarding her willingness to seek public assistance to help with finances while her husband was not working. She asked Lundgren to explore

what she was getting out of being chronically ill. She noted Lundgren had explained she did not drive due to losing her license as the result of an old DUI, and Lundgren was not willing to take steps to regain her license, instead depending on others for transportation. At every session, Lundgren wanted to focus on her physical problems, how others would or would not assist her, her family's opinions, and her anger over her situation. The therapist repeatedly noted she had to redirect Lundgren's focus to her feelings, coping mechanisms, and positive steps she could take to improve her life. (*Id.*)

On September 14, 2004, Dr. Wisco wrote to Lundgren's attorney to update his opinion regarding Lundgren's ability to work. He noted Lundgren's generalized pain problems due to fibromyalgia had worsened significantly over the previous ten months. She also had experienced progressive problems with numbness and a perception of weakness, probably representing manifestations of her fibromyalgia. Dr. Wisco opined Lundgren "would probably have difficulty doing any meaningful employment, even a sedentary job." (R. 315) He acknowledged that previously, he had opined Lundgren probably could do sedentary work, but he indicated, "With her worsening over the last year, it is extremely doubtful that she would be able to function even in this capacity." (*Id.*) He further noted Lundgren's problems would "last indefinitely." (*Id.*)

Lundgren saw Dr. Schryver on July 13, 2004, for follow-up of primary hypertension. Her mood was stable on the Prozac. She complained of feeling "run down a lot because she aches a lot and has had problems with fibromyalgia type condition." (R. 338) She continued to take Neurontin and Darvocet. The doctor noted Lundgren had been having "some myoclonic type activity" or "myoclonic jerks." (*Id.*) He adjusted Lundgren's blood pressure medication. (*Id.*)

Lundgren saw Dr. Schryver on August 4, 2004, with some chest discomfort that she thought might be due to her new blood pressure medication. He changed her medication. He also recommended an EKG, but Lundgren stated she had lost her health insurance and

could not afford the test. The doctor's office completed paperwork to request Lundgren's Neurontin, hormones, and blood pressure medication through an assistance program. (R. 337)

On September 14, 2004, Dr. Schryver updated his assessment of Lundgren's work restrictions as follows:

> My patient, Kia Lundgren, was given a work restriction in reference to our treatment of her chronic headache syndrome that was dated February 2004. The patient has been under the care of Dr. Wisco for her fibromyalgia. I have deferred the management and work restrictions regarding that disease process to him. If he feels that this particular form of fibromyalgia is severe enough where she is unable to work full time then I would accept that as an acceptable restriction regarding her overall fibromyalgia condition.
>
> My previous description regarding sedentary activity is based on management of her chronic headache syndrome.

(R. 336)

### 4. Vocational expert's testimony

The ALJ asked VE William Tucker to consider an individual forty-six years of age, forty-five at the amended alleged onset date,[4] with three years of college and Lundgren's past relevant work. The hypothetical claimant would be able to lift ten pounds frequently, twenty pounds occasionally; stand or sit for thirty minutes at a time, for a total of six hours in an eight-hour work day; do simple, routine, repetitive tasks; tolerate occasional changes in a routine work setting; frequently understand, remember, and carry out detailed instructions; and have occasional interaction with the public.

---

[4]Based on Lundgren's birthdate of October 10, 1957 (R. 373), it appears these ages are inaccurate. Lundgren would have been forty-six years old at her amended alleged onset date of November 10, 2003, and forty-seven at the hearing date of October 7, 2004.

The VE stated that with these limitations, the claimant would be unable to return to any of Lundgren's past relevant work, and she would not have any transferable skills. (R. 401-02)  However, the VE stated the individual would be able to work as a production assembler, an inspector and hand packager, or a marker or labeler, all of which jobs exist in significant numbers in the local and national economies.  (R. 402)

The ALJ then asked the VE to consider the same individual, but with a reduced lifting ability of five pounds frequently and ten pounds occasionally, and who would have to take three unscheduled fifteen-minute breaks each day.  The VE stated the three fifteen-minute breaks would preclude competitive employment.  (*Id.*)  Similarly, if the claimant had to lie down or sit with her feet up for half of the work day, she would be unable to work.  (R. 403-04)

## 5.    *The ALJ's decision*

The ALJ found Lundgren has not engaged in substantial gainful activity since her alleged disability onset date.  He found Lundgren to have severe impairments in combination including fibromyalgia, depression, cognitive disorder NOS, and obesity with history of headaches.  However, he further found her impairments, singly or in combination, do not reach the Listing level of severity.  (R. 34)  Regarding Lundgren's other alleged impairments, the ALJ found:

> The evidence has failed to establish the existence of a medically determinable impairment supported by medical signs and laboratory findings that could reasonably be responsible for producing the claimant's alleged symptoms concerning diarrhea; seizure disorder, neurofibromatosis, slurring of speech, instability of the right lower extremity, easy bruisability leading to lipoma formation or "sickness" causing their increased growth, or carpal tunnel symptoms/shakiness/ dropping of objects.

> No medically determinable mental impairment has been
> established such as a somatoform type disorder which could
> reasonably be responsible for the expression of symptoms
> indicated. Accordingly, the claimant's purported symptoms
> cannot be used to support a finding of disability – the
> ostensible degree of functional limitation regulating from the
> above purported impairments will not be rated.

(R. 26-27)

Because the ALJ found no medical evidence to support Lundgren's claim that her other symptoms are disabling, he found her complaints regarding those symptoms were not credible. He further gave no weight to the statements from her friends and family, except to the extent those statements were in agreement with the ALJ's assessment of Lundgren's residual functional capacity. He found Lundgren retains the residual functional capacity, both exertionally and nonexertionally, to perform work with the following limitations: lift up to twenty pounds occasionally and ten pounds frequently; stand for thirty minutes at a time, up to six hours in a workday; and sit thirty minutes at a time, up to six hours in a workday. He found Lundgren "is able to do simple, routine, repetitive tasks. She can have occasional changes in a routine work setting. She can have occasional interaction with the public." (R. 33)

The ALJ gave great weight to Dr. Wisco's November 10, 2003, opinions that Lundgren should not do any prolonged walking or standing; she would have difficulty with lifting, bending, or kneeling tasks; and she should be able to do sedentary work involving minimal repetitious hand use. However, the ALJ discounted the remainder of Dr. Wisco's opinion, finding Dr. Wisco did not have "available all of the evidence and inconsistencies available to the consulting physician for the state agency which indicate that the claimant had not been fully forthright in providing information to others concerning the existence, persistence and intensity of symptoms and functional limitations." (R. 29) The ALJ further noted Dr. Wisco did not have available "all of the evidence and inconsistencies in

the record now before the [ALJ] which also indicate the claimant's allegations are not well supported or entitled to full weight or credibility." (*Id.*)

The ALJ found Lundgren would be unable to return to her past work as a real estate agent, but he further found that "had she performed one of the other jobs indicated by the vocational expert . . ., she would have been and would be successful." (R. 32) The ALJ further noted Lundgren "does not have a long work history with higher earnings to add to the credibility of her allegations." (R. 33)

With regard to the statements of Lundgren's friends and family concerning her condition, the ALJ noted:

> In so far [sic] as the claimant has not been completely forthright in her descriptions concerning the existence, persistence and intensity of alleged symptoms and functional limitations, and as other individuals have based their opinions in reliance on information which the claimant wishes them to know or see, the statements are not found to credibly or persuasively support a finding of disability or limitation greater than assigned by the [ALJ].

(*Id.*)

The ALJ relied on the VE's testimony in finding Lundgren could work as a production assembler, inspector, or marker/labeler, each of which exists in a significant number. He therefore found Lundgren not to be disabled at any time through his March 11, 2005, opinion. (R. 34, 35)

## III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that

there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court "must affirm the

Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline, supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867

F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier*, 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third

parties and treating and examining physicians relating to such matters as:

1)       the claimant's daily activities;
2)       the duration, frequency and intensity of the pain;
3)       precipitating and aggravating factors;
4)       dosage, effectiveness and side effects of medication;
5)       functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. ANALYSIS

Lundgren argues the ALJ erred in rejecting the updated opinion of Dr. Wisco that Lundgren would be unable to sustain even sedentary work. She notes the state agency consulting opinions on which the ALJ relied heavily were based on medical evidence that predated her alleged disability onset date. She argues the ALJ gave insufficient reasons for discounting Dr. Wisco's later opinion. She also argues the ALJ failed to evaluate her credibility properly, and erred in his evaluation of the third-party opinions. The court agrees on all counts.

The ALJ recognized that Lundgren's impairments, in combination, were severe. However, the ALJ failed to recognize or address the debilitating nature of fibromyalgia in considering Lundgren's symptoms and her subjective complaints regarding her limitations. The record indicates Lundgren has sought continuous, ongoing medical treatment for her various medical problems since 1999, which bolsters the credibility of her complaints. None of her doctors indicated she was malingering or drug seeking. Indeed, if Dr. Wisco had believed Lundgren was being untruthful with him, as the ALJ intimates in his opinion,

the doctor would not have continued prescribing Neurontin and Darvocet, or continued to increase the dosages of those medications as Lundgren's symptoms worsened. In Dr. Wisco's updated opinion letter regarding Lundgren's condition as of September 2004, he noted Lundgren's condition had worsened significantly over the preceding ten months. Nevertheless, the ALJ relied solely on medical opinions based on evidence that predated Lundgren's amended alleged onset date. The court finds this was error.

The ALJ also appeared to overlook or even ignore the multitude of symptoms that can be related to fibromyalgia, including the diarrhea, irritable bowel syndrome, and instability in walking that were reported by Lundgren. Nor did the ALJ adequately assess the potential side effects from Lundgren's medications, which could include the ease in bruising, the slurred speech, and some of the cognitive difficulties Lundgren described.

In addition, in considering Lundgren's credibility, the ALJ failed to recognize that Lundgren continued to try to work for over a year after she felt she had become disabled initially. The Eighth Circuit Court of Appeals has "long recognized that fibromyalgia has the potential to be disabling[.]" *Forehand v. Barnhart*, 364 F.3d 984, 987 (8th Cir. 2004). As the court noted in *Forehand*:

> [A claimant's] ability to engage in some life activities, however, does not support a finding that she retains the ability to work. *See Brosnahan [v. Barnhart]*, 336 F.3d [671], 677 [(8th Cir. 2003)] ("[W]e have held, in the context of a fibromyalgia case, that the ability to engage in activities such as cooking, cleaning, and hobbies, does not constitute substantial evidence of the ability to engage in substantial gainful activity."). We have long stated that to determine whether a claimant has the residual functional capacity necessary to be able to work we look to whether she has "the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc). This test is consistent with relevant regulations on the issue,

> *see* 20 C.F.R. § 404.1545, and we have reiterated it on a
> number of occasions. . . . [Citations omitted.] Notwith-
> standing this well-settled case law, out mandate is frequently
> ignored, and appears to have been in this case.

*Forehand*, 364 F.3d at 988.

In this case, as in *Forehand*, the records from the claimant's treating physicians "amply support her allegations of pain and limitation." *Forehand*, 364 F.3d at 988. The court finds the ALJ erred in failing to give great weight to Dr. Wisco's opinion and to the treatment records of Lundgren's declining condition following her amended alleged onset date. The court also finds the ALJ erred in failing to give adequate consideration to the statements from Lundgren's family members and coworkers. The ALJ found these statements lacked credibility because Lundgren would have told people or allowed people to see only what she wanted them to see. This opinion is unreasonable, particularly with regard to Ms. Dias and to Lundgren's husband and mother, all of whom have observed the ongoing decline in Lundgren's health and her ability to function over a long period of time.

The Eighth Circuit has noted that substantial evidence to support an ALJ's findings exists when "on the record as a whole . . . [there is] evidence which a reasonable mind would find adequate to support the [ALJ's] findings." *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005); *accord Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). On this record, the court finds no reasonable mind would conclude the evidence supports the ALJ's finding that Lundgren is not disabled. On the contrary, the record contains overwhelming evidence that Lundgren has been disabled since her amended alleged onset date.

## V. CONCLUSION

The court may affirm, modify or reverse the Commissioner's decision with or without remand to the Commissioner for rehearing. 42 U.S.C. § 405(g). In this case, where the record itself "convincingly establishes disability and further hearings would

merely delay receipt of benefits, an immediate order granting benefits without remand is appropriate." *Cline*, 939 F.2d at 569 (citing *Jefferey v. Secretary of H.H.S.*, 849 F.2d 1129, 1133 (8th Cir. 1988); *Beeler v. Bowen*, 833 F.2d 124, 127-28 (8th Cir. 1987)); *accord Thomas v. Apfel*, 22 F. Supp. 2d 996, 999 (S.D. Iowa 1998) (where claimant is unable to do any work in the national economy, remand to take additional evidence would only delay receipt of benefits to which claimant is entitled, warranting reversal with award of benefits). In this case, the court finds the ALJ's decision should be reversed, and this case should be remanded for calculation and award of benefits.

Therefore, **IT IS RESPECTFULLY RECOMMENDED**, for the reasons discussed above, that unless any party files objections[5] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1)(C) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, the Commissioner's decision be reversed, and this case be remanded for calculation and award of benefits.[6]

**IT IS SO ORDERED.**

**DATED** this 29th day of September, 2006..

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[5]Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

[6]NOTE: If the district court adopts this recommendation and final judgment is entered for the plaintiff, the plaintiff's counsel must comply with the requirements of Local Rule 54.2(b) in connection with any application for attorney fees.